GARMAN TURNER GORDON LLP
ERIC R. OLSEN
Nevada Bar No. 3127
Email: eolsen@gtg.legal
MICHAEL R. ESPOSITO
Email: mesposito@gtg.legal
Nevada Bar No. 13482
650 White Drive, Suite 100
Las Vegas, Nevada 89119
Tel: (725) 777-3000
Fax: (725) 777-3112
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| NAC FOUNDATION, LLC, a Nevada limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>COREY JODOIN,<br><br>Defendant. | CASE NO. |

**DECLARATION OF MARCUS ANDRADE IN SUPPORT OF PLAINTIFFS' EX-PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER; AND MOTION FOR PRELIMINARY INJUNCTION**

I, Marcus Andrade, hereby declare and state as follows:

1. I am the manager of Plaintiff NAC Foundation, LLC ("<u>NAC</u>"), the Plaintiff in this action and I make this declaration in support of NAC's *Ex-Parte Application for Temporary Restraining Order; and Motion for Preliminary Injunction*.

2. I am competent to testify regarding the following facts, as I have personal knowledge of them and/or have been provided information such that I believe the facts to be true.

3. NAC is the creator of the Aten Coin, the first-generation non-anonymous digital currency.

4. The First Aten Coin Conference held in Warsaw Poland in October 2015 and was a major success.

5. After the Conference, Defendant Corey Jodoin (a resident of Alberta, Canada) approached Marcus Andrade, founder of Aten Coin and manager of NAC, unsolicited, about purchasing an interest in NAC.

6. An agreement was reached at that time for Jodoin to purchase a 5% interest in NAC from Mr. Andrade (the "Purchase Agreement").

7. Under the terms of the Purchase Agreement, Jodoin and his wife, Brandi, were also to perform work on behalf of NAC (the "Working Relationship").

8. In furtherance of the Working Relationship, NAC and Jodoin signed a Mutual Non-disclosure Agreement (the "NDA"), on or about November 3, 2015. A true and accurate copy of the NDA is attached hereto as **Exhibit 1-A**.

9. The NDA defines "Confidential Information" owned by NAC for purposes of the contract, and it mandates nondisclosure and prohibited use of such Confidential Information. All references to "Confidential Information" herein have the meaning assigned to them in the NDA. (See Ex. 1-A)

10. Jodoin was named Chief Operating Officer of NAC, and Mrs. Jodoin was named as Chief Administrative Officer.

11. The Working Relationship between NAC and the Jodoins terminated on March 4, 2016, when the Jodoins repudiated the Purchase Agreement and demanded both "back pay" and salaries going forward -- $10,000 per month for Jodoin and $5,000 per month for Mrs. Jodoin.

12. Despite termination of the Working Relationship, however, the Jodoins continued to hold themselves out to the public as officers of NAC, at least through the filing of the Complaint in this action.

13. Furthermore, beginning in late November 2015 (during the Working Relationship), and at various times, including April 27, 2016, Jodoin and his wife have contacted customers of NAC, contractors, and others, by use of Confidential Information of NAC, for purposes of disparaging and defaming NAC and its management, and of intentionally interfering with the contracts and prospective business advantage of NAC.

14. All of these communications have been in violation of the NDA and have been

1. extremely damaging to NAC, its management, and its affiliates.

15. This activity has continued even despite a cease and desist demand, and despite the commencement of this action, on May 12, 2016. A true and accurate copy of the cease and desist demand is attached to hereto as **Exhibit 1-B**.

16. On May 27, 2016, NAC held an Aten Coin 2016 Conference, in association with the Chicago-Kent School of Law in Chicago.

17. At the May Conference, an Aten Coin holder (the "Aten Coin Holder") who lives in Alberta, Canada, as do the Jodoins, informed Mr. Andrade that Jodoin and his wife had convinced him that NAC and Aten Coin was a "scam."

18. Plaintiffs believe that Jodoin used Confidential Information subject to the NDA in order to do so.

19. Further, Jodoin convinced this Aten Coin Holder to attend the May Conference for the specific purpose of interfering with existing and prospective coin holders and investors by publically declaring that Aten Coin was a "scam."

20. Based on the Jodoins' statements, the Aten Coin Holder attended the Aten Coin 2016 Conference.

21. After hearing the presentation at Chicago-Kent, however, the Aten Coin Holder elected not to carry out Jodoin's instructions and disclosed Jodoin's scheme.

22. Nonetheless, Jodoin had already sought to use this Aten Coin Holder as a tool of interference.

23. Jodoin had disparaged and defamed NAC, and had interfered with its contractual and prospective economic relationship with the Aten Coin Holder in order do so.

Executed this 7th day of July, 2016.

_____
MARCUS ANDRADE

Garman Turner Gordon LLP
650 White Drive, Suite 100
Las Vegas, NV 89119
725-777-3000

# EXHIBIT 1-A



# MUTUAL NON-DISCLOSURE AGREEMENT

This Mutual Nondisclosure Agreement ("Agreement") is made and entered into as of the last date signed below (the "Effective Date") by and between NAC Foundation, LLC., a Nevada limited liability corporation having its principal place of business at 7495 W. Azure Drive, Suite 110, Las Vegas, NV 8930, United States of America, ("NAC") and _Corey Jodoin_, a _____ whose principal mailing address _#31 54108 Range Road 280, Spruce Grove, Alberta, Canada T7X 3V3_ ("_CJ_").

WHEREAS NAC and __CJ__ (the "Parties") propose to work together in connection with a possible business relationship between the parties (the "Purpose"), including by entering into discussions and negotiations relating to the nature and terms of the Purpose, and wish to set out herein the terms and conditions upon which their respective Confidential Information (as defined below) may be disclosed to or used by the other in connection with the Purpose. Under this Agreement, the party receiving Confidential Information shall be referred to as the "Receiving Party," and the party disclosing such Confidential Information shall be referred to as the "Disclosing Party."

In consideration of the covenants and conditions set forth below, the Parties agree as follows:

1. **Confidential Information.** As used in this Agreement, "Confidential Information" means any information, including, without limitation, business technical, financial and marketing information, that is in written, oral or any other form, that a party designates as being confidential or that, under the circumstances surrounding disclosure, should be clear that it is confidential. "Confidential Information" does not include information that: (i) is in the public domain at the time it was disclosed or subsequently comes into the public domain through no fault of the Receiving Party; (ii) is already known to the Receiving Party before receipt from the Disclosing Party; (iii) is independently developed by the Receiving Party without use of Confidential Information; or (iv) becomes known to the Receiving Party, on a non-confidential basis, from a source other than the Disclosing Party without breach of this Agreement by the Receiving Party.

2. **Nondisclosure and Use.** A Receiving Party shall retain in confidence any Confidential Information received from the Disclosing Party. Except with the prior written consent of the Disclosing Party, the Receiving Party will not (i) disclose such Confidential

CONFIDENTIAL

_CJ_

Information to any other person or (ii) use such Confidential Information for any purpose other than the Purpose. Confidential Information may be disclosed only to employees or consultants of the Receiving Party or any parent or subsidiary of the Receiving Party who have a need to know such information, provided that such persons are made aware of this Agreement and either (i) agree to observe the terms of this Agreement or (ii) are bound by obligations of confidentiality to the Receiving Party of at least as high a standard as those imposed on the Receiving Party under this Agreement. The Receiving Party shall use the same degree of care as it uses to protect its own confidential information of a similar nature, but no less than reasonable care, to prevent the unauthorized use, dissemination or publication of the Confidential Information. The terms of this Agreement shall not be construed to limit either Party's right to develop independently or acquire products without use of the other Party's Confidential Information. The Disclosing Party acknowledges that the Receiving Party may currently or in the future be developing information internally, or receiving information from other parties, that is similar to the Confidential Information. Nothing in this Agreement will prohibit the Receiving Party from developing or having developed for it products, concepts, systems or techniques that are similar to or compete with the products, concepts, systems or techniques contemplated by or embodied in the Confidential Information provided that the Receiving Party does not violate any of its obligations under this Agreement in connection with such development.

3. **Legal Process.** If the Receiving Party becomes subject to a demand for discovery or disclosure of the Confidential Information of the other party under legal process, such Receiving Party shall give to the Disclosing Party prompt notice of the demand (where legally permissible) and shall cooperate with the Disclosing Party in seeking reasonable arrangements to protect the confidential and proprietary nature of the Confidential Information.

4. **Term and Duration.** This Agreement shall remain in effect for a period of two (2) years from the Effective Date unless otherwise terminated by either Party giving notice to the other of its desire to terminate this Agreement. The requirement to protect Confidential Information disclosed under this Agreement shall survive termination of this Agreement.

5. **Property Rights.** All Confidential Information provided pursuant to this Agreement shall remain the exclusive property of the Disclosing Party. Nothing contained herein shall be construed as a grant, express or implied or by estoppel, of a transfer, assignment, license, lease of any right, title or interest in the Confidential Information.

6. **No Warranty.** No warranty or representation is made by either party hereto that any information transmitted by it hereunder is true and correct, patentable or copyrightable, or that any such information involves concepts or embodiments that are free of infringement of other rights.

7. **Return of Confidential Information.** Upon the completion or termination of any discussions between the parties, or at any time within fourteen (14) days of receipt of a written request of the Disclosing Party, the Receiving Party shall at its election either (i) promptly return

to the Disclosing Party all Confidential Information disclosed in tangible form and copies thereof or (ii) promptly destroy such Confidential Information (including all copies thereof) and certify such destruction to the Disclosing Party.

8. **Equitable Relief.** The parties acknowledge and agree that the covenants set forth in this Agreement are reasonable and necessary for the protection of the parties' business interests and that irreparable injury may result if they are breached. The parties further agree that in the event of any actual or potential breach of any such covenant, the non-breaching party may have no adequate remedy at law and shall be entitled to seek immediate temporary injunctive relief. Nothing herein shall be construed as prohibiting any party from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of damages.

9. **No Other Business Relationship.** This Agreement does not represent or imply any agreement or commitment to enter into any further business relationship. This Agreement does not create any agency or partnership relationship between the parties or authorized a party to use the other party's name or trademarks. This Agreement does not preclude either party from independently pursuing any activities similar to or in competition with the Purpose contemplated herein. Neither party will be liable to the other for any of the costs associated with the other's efforts in connection with this Agreement.

10. **Export Control.** The parties recognize that communication or transfer of any information received pursuant to the Purpose may be subject to specific government export approval. Each party agrees to comply with applicable export control legislation with respect to Confidential Information received hereunder.

11. **Governing Law.** This Agreement shall be governed and construed in accordance with the laws of the State of Nevada, without giving effect to its choice of law or conflicts of laws principals. The parties consent to exclusive venue and jurisdiction for action hereunder in state courts located in Clark County, State of Nevada, and federal courts located in the U.S. District of Nevada.

12. **Successors and Assigns.** This Agreement will be binding upon the successors and/or assigns of the parties.

13. **Waiver.** No failure or delay by either party to enforce or take advantage of any provision or right under this Agreement shall constitute a subsequent waiver of that provision or right, nor shall it be deemed to be a waiver of any of the other terms and conditions of this Agreement.

14. **No Public Announcement.** Neither Party will, without prior approval of the other Party, make any public announcement of or otherwise disclose the existence or the terms of this Agreement.

15. **Severability.** In the event that any provision of this Agreement is prohibited by any law governing its construction, performance or enforcement, such provision shall be ineffective to the extent of such prohibition without invalidating thereby any of the remaining



provisions of the Agreement. The captions of sections herein are intended for convenience only, and the same shall not be interpretive of the content of such section.

16. **Entire Agreement/ No Amendment.** This Agreement constitutes the entire agreement and understanding of the parties with respect to the subject matter of this Agreement and supersedes and replaces all prior or contemporaneous agreements, written or oral, regarding such subject matter. Any amendment or modification of this Agreement shall be in writing and executed by a duly authorized representative of the parties.

17. **Counterparts.** This Agreement may be signed in counterparts, each of which shall be deemed an original, but which together shall constitute one and the same instrument.

IN WITNESS WHEREOF:

NAC FOUNDATION, LLC.

*Corey Jodoin*

FULL NAME (Print)

DocuSigned by:
*Marcus Andrade*  11/4/2015
77F864048B1D433...
Signature                     Date

*[signature]*  Nov 03, 2015
Signature                     Date

**Marcus Andrade**
*Printed Name*

*Printed Name*

Founder & CEO
*Title*

*Title*

# EXHIBIT 1-B

GARMAN
TURNER
GORDON

April 29, 2016

Eric R. Olsen, Esq.
Email: eolsen@gtg.legal
Direct Line: (725) 244-4576

Brandon M. Tesser, Esq.
Tesser Ruttenberg & Grossman LLP
12100 Wilshire Boulevard, Suite 220
Los Angeles, California 90025

Re: Brandi Jodoin, Corey Jodoin v. Marcus Andrade, NAC Foundation, LLC

Dear Mr. Tesser:

This firm represents NAC Foundation, LLC and related entities. From a copy we received of your letter dated March 31, 2016, we understand that you represent Brandi and Corey Jodoin. The purpose of this letter is demand that your clients cease and desist from various improper and/or prohibited activities impacting NAC Foundation, LLC and its affiliates (collectively "NAC Foundation").

First, we demand that your clients immediately cease and desist from holding themselves out as officers, employees, or agents of NAC Foundation.

Second, we demand that your clients cease and desist from publishing any further defamatory or disparaging statements to any third party concerning NAC Foundation or its officers, including but not limited to Mr. Andrade.

Third, we demand that your clients cease and desist from using of any confidential information of NAC Foundation, including but not limited to any and all lists of clients and/or client contact information, any financial information, and any other internal information. Furthermore, NAC Foundation demands that, within 14 days of the date of this letter, your clients turnover all copies of such confidential information to the undersigned, whether in hard copy or any other form, and that your clients provide an affidavit attesting that they have retrieved and turned over all copies of such confidential information that exist.

Fourth, we demand that your clients cease and desist from contacting customers of NAC Foundation for any purpose, and/or from otherwise interfering with NAC Foundation's contractual relations and prospective economic advantage.

GARMAN TURNER GORDON LLP
April 29, 2016
Page 2

With respect to the first demand, as of the date of this letter, Mr. Jodoin still holds himself out to the public as the Chief Operating Officer of NAC Foundation and Aten Coin, including on LinkedIn. This representation is false. He has not, as your own letter acknowledges, held that position for some time. This and any other representations that Mr. Jodoin is an officer, employee, or agent of NAC Foundation must cease immediately. So to must any representations of Brandi Jodoin that she is an officer, employee, or agent of NAC Foundation.

Our clients have also become aware of defamatory and disparaging remarks having been made by your clients to NAC Foundation's customers and perhaps to government officials. Specific instances of such communications have been reported by NAC Foundation's customers, as recently as two days ago. All such statements are false and damaging to NAC Foundation. Furthermore, your clients' intention in communicating these false and disparaging remarks seems clearly to interfere with NAC Foundation's customers and prospective economic advantage.

To be clear, all communications by the Jodoins with NAC Foundations clients must stop. Any communications are a violation of the Mutual Non-disclosure Agreement ("NDA") signed by Corey Jodoin November 3, 2015, because all information concerning the identity of clients (and their contact information) and the finances of the company was obtained by Mr. Jodoin subject to the NDA. To the extent that Mrs. Jodoin came into possession of this confidential information, she obtained possession from Mr. Jodoin.

Failure to comply with any of these demands will result in further action being taken by NAC Foundation, including but not limited to equitable relief, as provided in the NDA. To the extent such action becomes necessary, NAC Foundation reserves it right to recovery attorney fees and costs, and NAC Foundation hereby reserves all other legal rights and remedies against the Jodoins.

We look forward to your timely response.

Sincerely,

GARMAN TURNER GORDON

ERIC R. OLSEN, ESQ.

ERO:pp
Cc: Brooke Scott
    Corey Jodoin
    Brandi Jodoin
    Agnieszka Cenzartowicz
    Client